J-S18019-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: N.D., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.D., MOTHER | : : : : : : : : | |
| | : | No. 168 WDA 2024 |

Appeal from the Order Dated January 2, 2024
In the Court of Common Pleas of Washington County Orphans' Court at
No(s):  63-2023-0117

BEFORE:  PANELLA, P.J.E., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED: July 2, 2024**

J.D. ("Mother") appeals from the order terminating her parental rights to N.D. ("Child"). We affirm.

Child, born in April 2018, was brought into care in October 2021 after Washington County Children and Youth Services ("CYS") received a referral alleging domestic violence between Mother and her paramour, including sounds of children screaming and being smacked.[1] Further reports indicated the police and EMS had responded to the home because a child, Child's sibling, had been found unresponsive. Child's sibling had more than 15 bruises on his left leg, more than 10 bruises on his right leg, a large bruise on his right shoulder, and a concussion. CYS went to the family home to assess the remaining children's safety. Mother informed the caseworker the children were

_____

[1] Child's father is not known to the court.

with their maternal grandmother ("Grandmother"). CYS requested that Grandmother have children, including Child, seen by a medical professional, but was met with opposition, "described as belligerence, escalating to physical aggression." Opinion and Order of Court, filed Jan. 2, 2024, at 2. Child was ultimately taken to the hospital where he was found to have multiple bruises to his leg and ear. He also was diagnosed as autistic, and was non-verbal and aggressive. Child was adjudicated dependent in October 2021.

In January 2023, CYS filed a petition to terminate Mother's parental rights to Child. The trial court held a two-day hearing.

Dr. Neil Rosenblum testified that he completed two evaluations of Mother and Child—in November 2021 and November 2022. N.T., Oct. 23, 2023, at 23-24. He said that after his initial evaluation, he found that Mother had a "long history of chronic mental health difficulties and a diagnosis of intellectual disability." *Id.* at 24. He found she had "marginal coping skills and parenting skills with some limitations in her living skills" and is "easily taken advantage of by others and has been a victim of domestic violence in the past." *Id.* Dr. Rosenblum recommended weekly mental health treatment, identification of a support coordinator, a referral to the Achieva program for support services, coached visitation, and non-offender counseling. *Id.*

Dr. Rosenblum further testified that Child "is a special needs youngster who struggles" with "prominent behavior problems" and "impulse control," and likely was on the autism spectrum. *Id.* at 25. He stated that Child was a "very challenging child" who required a parent who could be confident,

consistent with discipline, and who could work cooperatively with specialized mental health and early intervention and special education services. *Id.* He testified it would have been "highly challenging" for Mother to meet Child's needs. *Id.*

Dr. Rosenblum testified that after the second evaluation he believed that Mother had followed through with some of the recommended treatment goals, including working with Achieva, who he believed provided support for at least one weekly visit and attending mental health counseling. He further stated that he was "pretty sure" Mother had said she was in "some type of non-offender's counseling." *Id.* at 26. He testified that he did not see much improvement in Mother's interactions with Child, noting she "largely would follow [Child's] lead," "had difficulty setting limits, and providing [Child] with structure [was] very difficult." *Id.* at 27. He stated Mother showed improvement in redirecting Child, but "her skills in doing so remain[ed] marginal and compromised." *Id.*

Dr. Rosenblum opined that reunification was not viable and that Mother would struggle to address Child's special needs and provide appropriate parenting, and there would be risk factors for Child "in terms of Mother's difficulty in interfacing with professionals and understanding which tactics that have led to harm and likely abuse on the part of [Child's] siblings." *Id.* It was his opinion that an alternate goal of adoption was consistent with Child's needs and welfare. *Id.*

Dr. Rosenblum testified that Mother was aware of Child's injuries at the time of placement, but she had "difficulty understanding how they occurred." *Id.* at 28. He stated that "Mother ha[d] made a very genuine effort to comply with some treatment recommendations" and "is genuinely motivated and cares about her children," but "the compromises and her adaptive living skills and cognitive capabilities . . . interfere with her ability to provide suitable care for [Child]." *Id.* He stated that Mother was "limited in her ability to engage in social interaction with other people, to travel independently in the community, [and] to be able to handle certain aspects of independent living, such as paying bills, making appointments." *Id.* at 30. Dr. Rosenblum testified Mother's strengths included that she could cook and prepare meals for herself and that she did a "pretty good job with her hygiene and self-care skills." *Id.* He felt that supervised visits should continue and that adoption mediation should be explored, as he believed it would be beneficial for Child to see Mother on occasion and that Mother would benefit from it. *Id.* at 29.

A CYS caseworker, Nicole Snyder, testified that she had been assigned to Child's case for approximately one year. *Id.* at 39. She stated Child has been with the current foster home since his adjudication of dependency. *Id.* at 43. Mother's initial goals included participating in individual psychological evaluation, including an assessment of cognitive functioning; participating in interactional evaluation with Child with a psychologist; engaging in parenting education with an appropriate provider and following all recommendations; cooperating with CYS and signing releases; obtaining and maintaining safe,

stable, and appropriate housing; and participating in offender and non-offender counseling. ***Id.*** at 44.

Snyder testified that Mother has not participated in non-offender's counseling. ***Id.*** at 45. She received a referral and completed an intake but refused services. ***Id.*** at 46. Snyder stated that Mother requested Dr. Bliss for the counseling, but Dr. Bliss was unavailable because she had completed a competency evaluation for Mother. ***Id.*** Snyder testified that Mother has had safe and appropriate housing throughout the case; Mother has refused to sign releases; Mother had been participating with Achieva until recently, when her visitation changed due to her work schedule; she has been participating in coached visitation; and Mother works with a support coordinator. ***Id.*** at 46-47. Snyder stated that Mother has been participating in mental health therapy, but it is not weekly. ***Id.*** at 48-49.

Snyder testified that Mother completed a competency evaluation with Dr. Bliss in March 2023. ***Id.*** at 49. Dr. Bliss found Mother to be competent. ***Id.*** Mother attends supervised visits with Child two times a week for three hours. ***Id.*** Snyder stated that there have been concerns about Mother's ability to handle Child's behaviors and redirect him. ***Id.*** at 50.

Snyder testified Child seems comfortable in his current placement and his needs are being met. ***Id.*** at 50, 54. Child looks to his foster parents for his daily needs and has a loving relationship with his foster parents. ***Id.*** at 54. Child has ADHD and has an IEP in school. ***Id.*** at 53. Snyder stated Mother does not attend Child's medical appointments or inquire about them. ***Id.*** at

53-54. She stated Child knows who Mother is. *Id.* at 55. She stated CYS supported the recommendation of adoption mediation. *Id.* Snyder agreed that the concern with Mother was not compliance but progress. *Id.* at 72. She further agreed that one issue preventing Mother from making progress is her inability to understand or admit that anything happened to Child to cause him to come into care. *Id.* at 72-73.

Mother testified that she completed parenting classes. N.T., Oct. 26, 2023, at 23. Mother said she met with the person for non-offender counseling one time and that he informed her he would call if she needed to make an appointment and he never called. *Id.* at 24-25. She stated she goes to a mental health counselor for anxiety once a month. *Id.* at 25.

Mother testified she sees Child twice a week for supervised visits. *Id.* at 26. She testified Child is happy and excited during the visits and he calls her "Mom." *Id.* Mother stated she did not feel comfortable with Dr. Rosenblum, stating, "He kept asking me if I miss sex. He kept talking about other – other kinds of things." *Id.* at 27.

Mother testified that she works as a resident aide with senior citizens. *Id.* She resides in a four-bedroom house and her mother lives two minutes away. *Id.* at 30. Mother stated she has resided at five different residences since the case commenced. *Id.* at 45-46.

Mother testified that she did not think CYS had reason to remove Child from her care, stating, "It was just medical." *Id.* at 38. She claimed that Child

did not have any bruises on him when he was taken to the hospital. *Id.* at 40-41.

A case worker at Twin Pines Family Services, Sydney Clemmer, testified that she has been involved with the family for approximately ten months. *Id.* at 53. When she first met Child, he was "unable to attend to task," had poor impulse control, and had trouble speaking and communicating his wants. *Id.* at 54. Child is now able to communicate his wants, has more impulse control, and is able to attend to task. *Id.* at 55. Clemmer stated she attended a visit with Mother and Child. *Id.* Child was extremely excitable, running across the room, and not holding conversations. *Id.* at 56. She stated Mother tried to gain his attention, but he could not be redirected. *Id.* Clemmer testified that the foster parents were able to redirect Child. *Id.* at 58.

Clemmer stated that when she attempted to speak with Child about Mother, "he began acting out by screaming, saying 'no, no, no,' acting as an animal and started growling and just kind of dissociated from the whole conversation by acting like an animal or trying to run away." *Id.* at 59.

The trial court granted the petition to terminate Mother's parental rights, finding termination proper under 23 Pa.C.S.A. §§ 2311(a)(1), (a)(2), (a)(5), and (a)(8), and 2311(b). Mother filed a timely notice of appeal.

Mother raises the following issue: "Whether the lower court erred in terminating the parental rights of a mother based upon expert testimony opining that a parent with intellectual disabilities cannot safely parent a child?" Mother's Br. at 4 (some capitalization omitted).

Mother argues that she was compliant with all recommendations at the six month review hearing, but reunification was not attempted. She notes Child had bruising when placed in CYS's care, but claims there was no finding the bruises occurred in Mother's presence. She claims that although CYS found Grandmother not suitable for placement, there was no discussion as to whether an aunt was considered as a placement resource.

Mother argues that termination was not proper under Section 2311(a)(1) because she was not provided an opportunity to perform any parental duties, even though she allegedly completed the parenting plan. She notes she was not permitted home visits and argues it was "unclear . . . what parental duties she was expected to perform under those circumstances." Mother's Br. at 6. She argues the court erred in finding termination under Section 2311(a)(2), arguing she "evidenced substantial improvement since the permanency plan was filed, including obtaining employment, taking classes in CPR and getting various certifications." *Id.* at 6. She notes she was not provided an opportunity to be instructed with Child in a home environment or afforded wraparound services. She claims the court relied on Dr. Rosenblum, but that Mother was not comfortable with him. *Id.* Mother claims her request for additional help was denied. She further claims that her request for a re-evaluation by another provider was denied.

Mother next claims the court erred in finding termination proper under Section 2311(a)(5). She argues that there was "no first-hand testimony as to [Child's] bruises." *Id.* at 8. She points out that Child has been with the current

foster family since shortly after placement, and one of the parents is a special education teacher, stating "[w]hile that may be marvelous for any child, that is not the standard by which Mother should be judged." *Id.* Mother claims she was not offered enough assistance.

We review an order involuntarily terminating parental rights for an abuse of discretion. *In re G.M.S.*, 193 A.3d 395, 399 (Pa.Super. 2018). In termination cases, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012)). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). We will reverse a termination order "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re Adoption of S.P.*, 47 A.3d at 826.

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Under this provision, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to

> Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citations omitted). To affirm the termination of parental rights, this Court need only affirm the trial court's decision as to any one subsection of Section 2511(a), along with Section 2511(b). ***In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. ***In re Adoption of K.C.***, 199 A.3d at 473. Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.* (citation omitted).

Here, the court found termination proper under subsections 2511(a)(1), (2), (5), and (8), as well as under Section 2511(b). As only one basis for termination under 2511(a) is necessary, we will focus on the court's termination of Mother's parental rights under subsection 2511(a)(2). That subsection provides that a parent's rights to a child may be terminated if:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

- 10 -

23 Pa.C.S.A. § 2511(a)(2). Section 2511(a)(2) thus requires the moving party to prove three factors by clear and convincing evidence: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re K.Z.S.*, 946 A.2d 753, 758 (Pa.Super. 2008) (citation omitted). "The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; those grounds may also include acts of refusal as well as incapacity to perform parental duties." *Id.* (citation omitted).

Here, the trial court found Mother has attempted to make progress, but, due to her intellectual disability and Child's needs, she is unable to parent Child:

> Agency Caseworker, Nicole Snyder, communicated at the TPR hearing that Mother's progress never exceeded minimal over the course of the dependency action. On cross examination by the [guardian ad litem ("GAL")], Snyder agreed with the GAL's statement that the issue in the instant matter is not compliance but progress. As Dr. Rosenblum agreed in cross-examination by Mother's counsel, Mother wants to do the best she can to parent N.D., but she just cannot do so as a result of her limitations paired with N.D.'s disabilities. Rosenblum opines that there is no reasonable degree of possibility of [M]other being able to meet N.D.'s needs even with additional support.
>
> Mother has completed a number of services such as parenting classes, mental health and visit coaching throughout this dependency action. There is no question that Mother has made an honest attempt to progress and

better herself for N.D. Nonetheless, Mother's intellectual disability creates an insurmountable incapacity to adequately parent her child. As testified by Dr. Rosenblum, it would be difficult for Mother to care for any child given her limitations, not to mention a child with complex needs such as N.D. Rosenblum continued that Mother's deficits in her adaptive level of functioning and inability to display a sufficient degree of independence cannot be mitigated and consequently presents a major obstacle to her parenting capabilities.

In summary, the repeated and continued incapacity of Mother has caused N.D. to be without essential parental care, control or subsistence necessary for his physical and mental well-being and the causes of Mother's incapacity cannot be remedied, despite a plethora of services offered to alleviate such concerns. Accordingly, in consideration of the forgoing, this [c]ourt finds that [CYS] has established, by clear and convincing evidence, the elements required pursuant to 23 Pa.C.S.A. [§] 2511(a)(2).

Op. and Order of Ct. at 19-20 (citations to record omitted).

The record support the trial court's findings, and it did not abuse its discretion in finding termination proper under Section 2511(a)(2).

The focus under Section 2511(b) is not on the parent, but on the child. *In re Adoption of R.J.S.*, 901 A.2d 502, 508 (Pa.Super. 2006). Under Section 2511(b), the trial court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the best interest of the child. *See* 23 Pa.C.S.A. § 2511(b). This inquiry involves the assessment of "[i]ntangibles such as love, comfort, security, and stability[.]" *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005). The court must also examine the parent-child bond, "with utmost attention to the effect on the child of permanently severing that bond." *Id.*

However, the "mere existence of an emotional bond does not preclude the termination of parental rights." *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011). Rather, the trial court must consider whether severing the bond "would destroy an existing, necessary and beneficial relationship." *Id.* (citation omitted). The court must also examine any pre-adoptive home and any bond between the child and the foster parents. *In re T.S.M.*, 71 A.3d at 268.

Here, the trial court found termination was proper under Section 2511(b). It noted that Child has made significant progress while in his foster parents' care, Mother has not progressed past supervised visits, and Child backtracks when in Mother's care:

> [T]his [c]ourt is tasked with evaluating the special needs and concerns of N.D. in making a best interest analysis. We know that, upon entering care, N.D. was non-verbal. Through his time in care, this has improved. Sydney Clemmer, the Minor Child's caseworker, testified that N.D. exhibited poor impulse control, lacked communication skills, and experienced outbursts when they first began working together. Clemmer testified regarding a visit with Mother and N.D. on February 21, 2023, where the child was described as "extremely excitable, loud, could not attend to task, and could not hold a conversation." Mother struggled to gain N.D.'s attention and redirect him. Mother tried to change course by kindly grabbing him, but he would not listen to her. Similarly, in March of 2023, Achieva visitation coach, Chantel Reaves, reported that Mother required visit coaching due to similar concerns. In fact, at [the] hearing on the TPR petition, testimony establish that, although some improvements were seen, Mother continues to require visit coaching, emphasizing that Mother never progressed to unsupervised visitation with N.D.
>
> This information is important to a 2511(b) analysis because the testimony and record support that N.D. has flourished developmentally since being placed with foster parents,

something that it appears cannot be maintained with Mother. Clemmer testified to improvements with N.D.'s communication skills and his impulse control. Clemmer communicated that when observing N.D.'s interactions with Foster [P]arents, Foster [P]arents were able to redirect him. However, in contrast, N.D. appears to have a strained emotional connection and backtracks with his progressions with [M]other. In example, Clemmer testified that, when she attempts to discuss his mother, N.D. begins acting animalistic and tries to run away. In another instance, N.D. ceased communication when [M]other was mentioned by the counselor. Further, upon seeing [M]other at a recent court proceeding, N.D. again acted like an animal and dissociated. This testimony does not support a finding of a necessary and beneficial relationship.

Clemmer testified that she broached the topic of permanency with N.D., and he unequivocally expressed that he did not want to leave his foster parents' home. As Dr. Rosenblum opines, N.D. has made marked progress developmentally, emotionally, and physically since being removed from [M]other's care. While there is no question that Mother undoubtedly loves her child, the bond does not outweigh N.D.'s need for safety and permanency. Dr. Rosenblum has opined that Mother and Foster [P]arents should participate in adoption mediation so that Mother and N.D. may maintain a degree of contact with each other. Nevertheless, Dr. Rosenblum supports [CYS's] petition and the goal change to adoption and this [c]ourt agrees.

Based on the above, this [c]ourt finds that [CYS] has established by clear and convincing evidence the elements of 23 Pa.C.S.A. § 2511(b).

Op. and Order of Ct. at 23-25.

The record supports the court's factual findings and it did not abuse its discretion in finding termination best meets Child's developmental, social, and physical needs.

Order affirmed.

- 14 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 07/02/2024